**PSI ENERGY, INC., Plaintiff–Appellee,**

v.

**EXXON COAL USA, INC., and Exxon Corporation, Defendants–Appellants.**

**No. 93–1088.**

United States Court of Appeals, Seventh Circuit.

Argued March 31, 1993.

Decided April 15, 1993.

Rehearing Denied May 20, 1993.

Alan S. Brown, Robert F. Zoccola (argued), Thomas L. Davis, Locke, Reynolds, Boyd & Weisell, Indianapolis, IN, and Donald P. Bogard, Plainfield, IN, for plaintiff-appellee.

John D. Nell, William P. Wooden, Katherine L. Shelby, Mary L. Titsworth, Wooden, McLaughlin & Sterner, Indianapolis, IN, David J. Beck, Amy Murdock, Beck, Redden & Secrest, James K. Wilson, Exxon Coal and Minerals Co., Houston, TX, Robert Anthony Burgoyne, Keith A. Jones (argued), Fulbright & Jaworski, Washington, DC, and Richard J. Wilson, Fulbright & Jaworski, Houston, TX, Richard R. Wilson, Vuono, Lavelle & Gray, Pittsburgh, PA, for defendants-appellants.

Before BAUER, Chief Judge, EASTERBROOK, Circuit Judge, and REAVLEY, Senior Circuit Judge.[*]

EASTERBROOK, Circuit Judge.

PSI Energy burns coal to supply southern Indiana with electricity. Increasingly stringent environmental regulation requires PSI to limit the sulfur dioxide emitted from its plants. To do this PSI must install "scrubbers," large devices that precipitate the sulfur out of the stack gasses and leave a noxious slurry of sulfur and limestone. High costs of removing sulfur from coal after combustion give a competitive advantage to coal that contains less sulfur, and to plants situated in places where the EPA permits the emission of extra sulfur dioxide. Utilities that have not found the optimal mix of clean coal at low prices and pollution control technology have encountered pressure from regulatory agencies. See *Northern Indiana Public Service Co. v. Colorado Westmoreland, Inc.*, 667 F.Supp. 613 (N.D.Ind.1987), affirmed mem., 845 F.2d 1024 (7th Cir.1988); *Northern Indiana Public Service Co. v. Carbon County Coal Co.*, 799 F.2d 265 (7th Cir.1986).

Nineteen years ago PSI Energy contracted with a predecessor to Exxon Coal for a 29-year supply of high-sulfur coal, some 3 million tons per year. Exxon's coal is approximately 3.3% sulfur, leading to 6.2 pounds of sulfur dioxide per million Btu. The EPA has reduced allowable emissions at PSI's Gibson generating station (where it burns the coal Exxon supplies) to 3.57 pounds of $SO_2$ per million Btu, and by 1995 PSI must cut these emissions to 2.5 pounds per million Btu. Complying with these rules requires additional scrubbers or reducing the sulfur content of the coal to be burned. Further reductions may lie in store, yet costly rules do not permit PSI to avoid its obligation. Under the agreement PSI must take the coal "regardless of conditions imposed by [environmental] laws, rules or regulations". Section 16.01. PSI would like to escape its commitment or drive down the price to recoup the cost of removing the sulfur from the coal Exxon delivers.

The contract provides a way to do just this. The price of coal is not fixed. It has several components: a "Base" defined as the price F.O.B. the customer's power plant (see U.C.C. § 2–319) and a table of adjustments called "Exhibit A". These adjustments produce changes in the effective price on account of changes in the cost of labor, transportation, and the value of money, among other items. Other clauses of the contract provide still more adjustments. Article III reduces the price if the coal has too much water or ash and imposes a penalty for sulfur exceeding a defined limit. Thus the delivered price changes frequently. But mechanical computations according to Exhibit A and other clauses do not necessarily track the market for coal. At five-year intervals, the parties may renegotiate the Base and the table of adjustments. Fresh negotiation ensures that the price in the long-term contract does not depart too far, or for too long, from the market price. Paul L. Joskow, *Price Adjustment in Long–Term Contracts: The Case of Coal,* 31 J.L. & Econ. 47 (1988); Victor P. Goldberg & John R. Erickson, *Quantity and Price Adjustment in Long–Term Contracts: A Case Study of Petroleum Coke,* 30 J.L. & Econ. 369 (1987). See generally Keith J. Crocker & Scott E. Masten, *Pretia Ex Machina? Prices and Process in Long–Term Contracts,* 34 J.L. & Econ. 69 (1991); Victor P. Goldberg, *Price Adjustment in Long–Term Contracts,* 1985 Wis.L.Rev. 527; Richard S. Lambert,

---

[*] Hon. Thomas M. Reavley, of the Fifth Circuit, sitting by designation.

*Long Term Contracts and Moral Hazard,* 14 Bell J. Econ. 441 (1983). Rising costs of removing sulfur after combustion have led to a substantial fall in the market price of high-sulfur coal relative to low-sulfur coal. Falling prices of energy in general also have undercut the market position of firms holding reserves of high-sulfur coal. PSI hoped to take advantage of both effects in renegotiating with Exxon during 1991 and 1992 for the new price to take effect on January 1, 1993. Because the Exhibit A adjustments were increasing the delivered price of Exxon's coal during the 1980s, while the market price for high-sulfur coal was eroding, PSI anticipated a substantial savings.

An opportunity to renegotiate in mid-contract poses the question: what happens if the parties do not agree? If, for example, the seller's last offer prevails in the event of disagreement, then the seller has little reason to reduce its price to the current market. There is a similar, though reversed, problem if the buyer's last bid prevails. If inability to agree permits the parties to walk away from the deal, then the arrangement is not really a long-term contract after all. It becomes a five-year contract with a framework for renewal on mutual consent. Yet the parties may have strong reasons for preferring a genuine long-term contract. A long-term contract allows each side to make capital investments that facilitate performance, investments in goods whose useful life exceeds five years, and which therefore may be sensible (if they are specialized in some way to the other party's needs) only if they can be amortized over a longer period.

One way to drive the offers together during price renegotiation, while preserving the long-term nature of the arrangement, is to permit the buyer to obtain other bids while allowing the seller to "match" these. The possibility of a competitive offer, which defines the current market price, propels the parties toward agreement while ensuring that, as long as it charges no more than the current market price, the seller continues to receive the business. And this is what the Exxon–PSI contract provides. Section 7.03 reads:

Either party may require renegotiation of the Base by giving to the other, at any time in the first thirty (30) days of the fourth year of any contract period ..., written notice of its desire to do so. Promptly after the giving of such notice, the parties will commence negotiations to agree upon a new Base to be effective as of commencement of the next contract period. Each party covenants with the other to participate in such negotiations in a good faith effort to reach agreement. If the parties are unable to reach agreement, BUYER will accept SELLER's last offer or present SELLER with a firm, written offer which it has received from another supplier, which it is willing to accept, for the supply of coal called for under the remaining term of this Agreement (herein referred to as a "competitive offer"). It shall also provide SELLER with documentary proof of such offer, and permit SELLER to examine all supporting data and information submitted with the offer. SELLER shall have the right to meet such competitive offer.

If, by the one hundred and eightieth day preceding the end of the contract period in which notice of price negotiation was given, the parties have agreed upon a new Base, appropriate changes shall be made to the adjustment factors provided in Exhibit "A". The Price of coal effective at the commencement of the next contract period shall be computed from the new Base adjusted under the provisions of Exhibit "A" from the reference date of the new Base. If, by such time, the parties have not reached agreement upon a new Base and SELLER declines to meet a competitive offer submitted by BUYER pursuant to the above provisions, this Agreement shall terminate at the end of the contract period in which notice of price negotiation was given, or at BUYER's election, at the end of the temporary continuance of deliveries as provided for in Section 7.04.

Notice that the objective of the renegotiation is to update the Base in light of market conditions. The contract contemplates

price negotiation for an identified product, not a bid for a different product or the reworking of the many other terms. Coal differs in multiple dimensions, including sulfur, ash, water, and heat content. Renegotiation or competitive bidding on a price per ton is futile unless these attributes of quality are held constant. To assure this, § 7.05 provides:

It is understood and agreed that the purpose and intent of Sections 7.01 to 7.04, inclusive, are only to provide for renegotiation of Base and Exhibit "A", and neither party shall inject into such negotiations, as a condition of agreement upon a new Price for the coal, any demand or request that other terms and conditions of this Agreement be altered.

Sections 7.03 and 7.05 need not mean that a competitive bid must *duplicate* the Exxon–PSI arrangement. Identical terms are impossible, given that Exxon supplies PSI with coal from a mine in Clinton County, Illinois. Rivals will offer deliveries from different places, and different coals necessarily will have different sulfur, ash, water, and heat contents. What §§ 7.03 and 7.05 make clear, however, is that Exxon can respond to competition by reducing its price without altering other features of the arrangement. This protects both sides from the expropriation of any relationship-specific capital investments. Exxon can't raise the price above market, and a competitive bid will reflect the cost to other producers that have yet to make any relationship-specific investments, so that Exxon can recover the costs of its own investments. The matching process also becomes simple. Just as other bidders need not duplicate Exxon's terms, so Exxon need not match its rivals'. Differences in the quality of coal are handled by the terms of the original agreement: for example, "dirtier" coal offered by a rival incurs a penalty under Article III, enabling the parties to disregard the sulfur content and compare the bids by looking at Base alone.

When PSI exercised its right in 1991 to renegotiate the price for the five-year period beginning January 1, 1993, adjustments under Exhibit A had driven the delivered price of coal to more than $37 per ton.

Exxon concedes that "this was considerably higher than the prevailing price for coal of comparable quality." Several rounds of offers left the parties far apart. PSI contended that a price of $17 per ton, F.O.B. mine, would be generous, while Exxon proposed a price of approximately $25 F.O.B. mine. At PSI's request, Exxon made a final Base offer: $30 F.O.B. the Gibson station, in the process updating all of the Exhibit A adjustments so that as of January 1, 1993, this would be the full delivered price for the coal.

Concluding that it could do better, PSI solicited competitive offers. Its call for bids invited other suppliers to fix their own terms. PSI did not ask them to come as close as possible to the provisions of the Exxon–PSI contract, limiting the competition to price. It did not ask them to submit alternative bids, one using the terms they preferred and the other using the Exxon–PSI agreement as a model. Not surprisingly, the bids PSI received differed dramatically in both price and structure from those embodied in the Exxon–PSI agreement. Of the three bids it received, PSI favored that submitted by Black Beauty Coal Company. Although Black Beauty offered high-sulfur coal, its sulfur dioxide emission of 5.0 to 6.2 pounds per million Btu is less than that of Exxon's coal. In just about every other way, too, Black Beauty's offer is superior to the Exxon–PSI contract: lower price, more flexible delivery terms, a more lenient force majeure clause, and so on. Because Black Beauty's mines are closer to PSI's generating stations, transportation costs also would fall. One catch is hidden in this last sentence: Black Beauty's mines. Instead of offering approximately 3 million tons of coal annually from one mine, Black Beauty offered approximately 1 million tons of coal annually from each of three mines. Three different coal seams, in three different locations, with three different price-quality combinations. Under the Black Beauty offer, each mine's coal has a separate "starting price" F.O.B. mine, with adjustments. PSI may designate any of the three mines

as the source for deliveries to a number of its generating stations.

Flexibility in designating sources would enable PSI to curtail its transportation costs and to mix Black Beauty's coal with low-sulfur coal at several stations, rather than burning everything at Gibson, as it had been doing with Exxon's deliveries. But the multi-mine offer posed a problem for Exxon. How was it to match this amalgam of price-quality-delivery combinations with a single Base price, as §§ 7.03 and 7.05 contemplate? PSI did not furnish Exxon with an estimate of the equivalent Base that would meet Black Beauty's offer. Instead it demanded that Exxon duplicate all terms of the Black Beauty bid. Exxon, which interpreted the contract to require (and allow) a single Base price, F.O.B. the Gibson station, countered that Black Beauty's multi-price offer was not a "competitive offer" within the meaning of § 7.03. The only way to make that offer competitive, Exxon insisted, would be to construct a weighted price. This it did, as follows:

| Mine | Annual Tonnage | Percentage Weight | F.O.B. Gibson Price | Weighted Price |
|------|----------------|-------------------|---------------------|----------------|
| Columbia | 1,100,000 | .366667 | $19.50/ton | $7.150/ton |
| Miller Creek | 800,000 | .266667 | $26.75 | $ 7.133 |
| Viking | 1,100,000 | .366667 | $24.50 | $ 8.983 |
| Weighted Average Price F.O.B. Gibson | | | | $23.266 |

Each of Black Beauty's three mines had a minimum and maximum annual tonnage under the proposed contract. Exxon started with the minimum annual tonnage from each mine. The "percentage weight" is this number divided by 3 million tons. Exxon added freight from each mine to the Gibson power station to derive that mine's F.O.B. Gibson price. Multiplying this price by the percentage weight yields a weighted price; adding these three produces the expected price per ton F.O.B. Gibson. (Using the mean or maximum tonnages from each mine would have produced a slightly higher price F.O.B. Gibson.) Exxon told PSI that it would be willing to match this price, $23.266 per ton, and to adopt Black Beauty's Exhibit A adjustments verbatim, if the Black Beauty bid were indeed a "competitive offer."

PSI denied that Exxon's calculation was correct but offered no alternative. Instead it commenced this diversity suit, seeking a declaratory judgment that Exxon has failed to meet a competitive bid, so that the contract terminates on January 1, 1993. PSI insisted that Exxon could match the Black Beauty offer only by matching the delivered price to each of its generating stations, and by making additional concessions tracking Black Beauty's favorable non-price terms (such as the generous force majeure clause). Exxon filed a counterclaim seeking a declaration that the Black Beauty offer is not a "competitive offer" and that, if it is, a Base of $23.266 per ton matches the offer. Exxon asked the district court to declare that Base for the period beginning on January 1, 1993, is its offer of $30 plus an updated Exhibit A. PSI rejoined that the "real" last offer was $23.266, not $30. On one thing the parties agreed: Indiana law governs.

The district court held an expedited trial. Ruling that Black Beauty's bid is a "competitive offer" that Exxon had not met, the court issued the requested declaratory judgment on December 28, 1992. The court concluded that the Exxon–PSI agreement is not ambiguous, that a rival bid need not incorporate the material terms of the Exxon–PSI agreement to be a "competitive offer", but that Exxon can meet such an offer by adjusting its Base price alone. That is, the court rejected PSI's argument that Exxon must duplicate all of the rival's

non-price terms. Nonetheless, the court concluded, in order to match an offer containing valuable non-price concessions, Exxon must "offset non-base related concessions in the competitive offer with corresponding reductions on the Base." Because Exxon had not done this, and because it had not afforded PSI delivery flexibility that would lead to reduced transportation costs, $23.266 per ton did not match the value of Black Beauty's offer to PSI, and the contract terminated. We accelerated Exxon's appeal.

 We are less certain than the district court that the contract is unambiguous. Exxon offered one reading, PSI another, and the district judge rejected *both*, reading the agreement in a way no one had suggested. This implies a latent ambiguity—a problem that becomes apparent only when an event that the parties did not contemplate occurs. See *Amoco Oil Co. v. Ashcraft*, 791 F.2d 519, 521 (7th Cir.1986); *Ohio Casualty Group v. Gray*, 746 F.2d 381, 383 (7th Cir.1984) (both discussing Indiana law). That unanticipated event is a multi-mine competing bid, which makes the calculation of a single delivered price difficult. A court encountering a latent ambiguity should try to reconstruct "how the parties would have dealt with the contingency had they made specific provision for it." *Amoco*, 791 F.2d at 521. The kinds of extrinsic evidence the parties offered—such as PSI's internal planning documents from the 1980s and that firm's submissions to the state electricity regulatory commission between 1988 and 1990—are not helpful in addressing that question. Instead, when the language of the contract runs out, we must try to understand the *function* of the language and complete the agreement in light of the parties' mutual objectives.

Section 7.03, which establishes the competitive offer procedure, does not specify the allowable contents of an outside bid. Like the district court, we believe that a "competitive offer" cannot be limited to one duplicating the Exxon–PSI agreement and changing only the Base price plus Exhibit A. Duplication is impossible, if only because another supplier's coal will come from a mine other than Monterey No. 2 in Clinton County. Article III of the Exxon–PSI contract, coupled with Exhibit A, provides automatic adjustments for the most common quality variables. If another producer's coal has more ash, or a different quantity of sulfur, or a different point of origin, the allowance can be read off the contract. Each party's Base bid will capture the effects of these variances.

Article III was written to penalize excess ash, water, sulfur, and the like. Thus if a competitor's coal is cleaner than Exxon's, or burns better, there is no comparable adjustment. Other clauses, such as Article XI on force majeure, do not contain price adjustments of any kind. This means that a rival's bid can be superior, from PSI's perspective, even at the same price per ton Exxon proposes to charge. An effort to obtain the maximum value from other offers is what led PSI to argue that *any* bid, even one with substantially different terms and multiple prices, is a "competitive offer" that Exxon may "meet" only by matching the rival's terms as well as its price. Anything else diminishes the power of competition.

In deciding whether Black Beauty's offer was competitive within the meaning of § 7.03, it is helpful to consider how, under § 7.05, Exxon responds. All agree that under § 7.05 Exxon need not renegotiate with PSI anything other than Base and Exhibit A. That is what § 7.05 says, describing "the purpose and intent of Sections 7.01 to 7.04, inclusive". As we read this contract, the competitive offer process established by § 7.03 is an integral part of price renegotiation—the potential for competition is the engine driving renegotiation, and by meeting a rival's offer Exxon agrees to a renegotiated price. Exxon and PSI agreed at the outset that they would be better off with a long-term contract, including some insulation from the full vigor of competition during the next three decades, than with a short contract followed by an entirely fresh competition for the business. Exxon's ability to limit the competition to price, and price alone, for the kind of coal Exxon has to offer, is what

makes this a genuinely long-term contract, with corresponding protection for any relationship-specific capital investments. This cannot be achieved if Exxon must match the *value* of a rival's non-price terms by reducing its Base. Moreover, the entire conception of the renegotiation and competitive bid process as a way to mark Base to market would fail if non-price aspects of rival bids had to be evaluated and reflected in the Base. How can these terms be reduced to a single price? PSI does not know, and neither do we. This is why PSI argued in the district court that Exxon must match the terms themselves, and not offer price concessions derived from the value of the non-price terms. Where this leads us, however, is agreement with the district court that § 7.05 entitles Exxon to match a "competitive offer" by changing its Base and Exhibit A, without matching non-price elements of the rival's bid.

■ This understanding of what Exxon must do to match an offer implies limits on the content of a "competitive offer." An offer may be "competitive" although the non-price terms differ in some material respects from the terms of the Exxon–PSI contract, but that one indispensible element of a "competitive offer" is a price that can be matched by a single Base. Black Beauty quoted three starting prices, not one, and with multiple potential adjustments. This is not a "competitive offer" because it cannot be matched by a single Base. Exxon tried to derive a single equivalent from Black Beauty's offer. By insisting that this conversion was inaccurate—indeed, that a conversion to a single price was impossible and irrelevant—PSI disqualified the Black Beauty bid from treatment as a "competitive offer." Exxon did not need to match what could not be matched. Under § 7.03 the parties must proceed during 1993–97 using Exxon's "last offer".

Although not strictly necessary, it is prudent to resolve the parties' dispute about Exxon's basing point. PSI observes that the agreement does not limit deliveries to the Gibson plant, although it concedes that with the exception of a single shipment all of Exxon's coal has gone to Gibson. PSI may instruct Exxon to deliver coal to any of its plants. Application of Exhibit A leads to an automatic price adjustment: if delivery to this other plant is more costly than delivery to Gibson, Exxon adds the difference in freight; if delivery is less costly, Exxon deducts the difference. That PSI can select a destination of its choice does not imply that Exxon must quote multiple base prices. The agreement contemplates one Base, with adjustments for higher or lower freight made through Exhibit A. Exxon is entitled to use Gibson as the basing point for that single Base, and for purposes of meeting another bid. Section 6.01 could not be clearer: "Coal shall be delivered to BUYER by SELLER, F.O.B. BUYER's Gibson Power Plant, or other points in Indiana which BUYER designates." Because there is only one Base, the price must be F.O.B. Gibson. PSI has never asked Exxon to change the (sole) Base to a station other than Gibson. Quite the contrary, PSI instructed Exxon to quote, as its "last offer", a single Base F.O.B. Gibson, with an updated Exhibit A.

One final comment is appropriate. We have reasoned backward, from the matching process to a definition of a "competitive offer", on the assumption that all of the non-price terms in another bid would be more favorable to PSI. Suppose it were the other way around—for example, that the rival's bid called for PSI to pay for the draglines and other equipment, in exchange for which the rival would reduce its price dramatically. By matching the rival's price, Exxon would be swallowing the value of PSI's concession—a concession PSI extended only to the rival, not to Exxon. Such a possibility leads to the conclusion that a bid is not a "competitive offer" unless all of the terms are at least as favorable to PSI as the terms in the Exxon–PSI agreement. Black Beauty's bid omits any provision comparable to Article VIII of the Exxon–PSI contract, entitled "price relief for economic hardship". Exxon submits that this omission disqualifies the Black Beauty bid. Our approach makes an answer to this contention unnecessary, but it should be apparent that in the round of renegotiation preceding the

final five-year period (which begins January 1, 1998) a rival bid inferior to Exxon's in any material respect runs a substantial risk of being deemed not a "competitive offer".

The judgment is reversed, and the case is remanded so that the district court may consider arguments that it bypassed in light of its conclusion that Black Beauty's offer was "competitive" and that Exxon had not met it. PSI maintained that Exxon did not renegotiate in good faith, as § 7.03 requires, and that Exxon's "last offer" was $23.266 rather than $30 because the offer of $30 lacked some important terms. It would be inappropriate for us to address these questions without the benefit of the district court's views. Circuit Rule 36 shall not apply on remand.