In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3374

THOMAS TEMME, individually and
as representative of a class of persons
similarly situated, et al.,

*Plaintiffs-Appellants,*

*v.*

BEMIS COMPANY, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 2:08-CV-00090—**J.P. Stadtmueller,** *Judge.*

ARGUED FEBRUARY 22, 2010—DECIDED SEPTEMBER 13, 2010

Before KANNE and WILLIAMS, *Circuit Judges*, and
SPRINGMANN, *District Judge.**

WILLIAMS, *Circuit Judge.*    For over twenty years, a
small group of 62 retirees, former plant maintenance
workers and their spouses, have been receiving their

* Hon. Theresa L. Springmann, United States District Judge
for the Northern District of Indiana, sitting by designation.

health care coverage through Hayssen Manufacturing Company ("Hayssen") and its successor, Bemis Company, Inc. ("Bemis") as a result of a 1985 Plant Closing Agreement. In 2005, Bemis changed the insurance provider of its medical plan and made changes to deductible and co-pay amounts related to medical care and prescription drugs. In 2007, Bemis also informed the retirees that it would no longer provide a prescription drug benefit. The retirees then sued under the Labor-Management Relations Act, 29 U.S.C. § 185(a), and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, alleging that the 2005 and 2007 changes breached the agreement negotiated by an employer and a labor organization. The district court held that the Plant Closing Agreement included no promise of lifetime benefits to the retirees and granted summary judgment to Bemis. However, we find that the parties' agreement was to provide lifetime benefits to retirees and remand the case to the district court for further proceedings on the question of whether Bemis breached its agreement by making the changes to the retirees' medical benefits.

## I. BACKGROUND

Since Bemis prevailed on summary judgment, we recount the facts in the light most favorable to the class represented by Thomas Temme, the party against whom the motion under consideration was decided. *Bassiouni v. F.B.I.*, 436 F.3d 712, 721 (7th Cir. 2006). Hayssen and the United Automobile Aerospace and Agricultural Implement Workers of America and its Local No. 1423

Union ("the Union") were parties to a series of collective bargaining agreements covering the production and maintenance workers at the Hayssen facility in Sheboygan, Wisconsin. The last collective bargaining agreement negotiated between the parties was an agreement covering the period from 1982 to 1985. When this 1985 Collective Bargaining Agreement ("CBA") expired on June 30, 1985, a strike ensued. The strike continued through the summer, and Hayssen eventually decided to close its Sheboygan plant and relocate its manufacturing operations.

In connection with this plant relocation, the parties negotiated a Plant Closing Agreement ("Closing Agreement") with the goal of "embodying the full and complete terms and conditions regarding the effects of the termination of [Hayssen]'s manufacturing operations and the termination of employment for all employees represented by the Union." The first three paragraphs of the Closing Agreement terminated the employment relationship between union employees who retained seniority under the CBA and Hayssen, terminated the strike, and terminated the bargaining relationship between Hayssen and the union. Paragraph 4 concerned the termination of benefits. Paragraph 4(a) modified the pension plan and provided for a "vested" termination of the plan. Paragraph 4(b) referred to the CBA and listed the fully satisfied obligations and claims under the CBA. Paragraph 4(c) explained the calculation of severance pay and the necessity of executing a release as a condition for receiving the severance pay. Paragraph 5 contained a general statement releasing the

company from claims arising under the CBA and an agreement that no requests would be made to Hayssen for any benefits beyond that provided by the Closing Agreement. Finally, Paragraph 6 stated that the Closing Agreement is the full and complete agreement between the parties, superseding and voiding any prior agreements such as the CBA "except and only to the extent that reference to the same may be necessary to effectuate the provisions of this agreement."

One provision in Paragraph 4 concerned medical benefits. Because its meaning is the focus of the litigation between the parties, we recite the language of paragraph 4(d) in full:

> (d) <u>Health/Medical Benefits</u>—Employees terminated under the provisions of this agreement with the exception of those eligible employees who apply for retirement benefits by 12/31/85, will be allowed to continue their present Blue Cross/ Blue Shield Medical coverage by paying the full monthly premium for a period of 12 months (1/1/86 to 1/1/87) or until they become covered by another medical insurance plan, whichever is sooner. If such an employee is covered as a dependent under another medical insurance plan, the Blue Cross/Blue Shield plan would be the secondary payer. If an individual becomes covered under another plan within the 12 month period, his/her eligibility under the Blue Cross/Blue Shield plan will cease immediately and there will be no co-ordination of benefits.

The premium rates for such coverage are currently $72.50 per month for single coverage and $178.14 per month for family coverage. These premium rates have been historically reevaluated by Blue Cross/Blue Shield on July 1 of each year. Employees who elect to continue their Blue Cross/Blue Shield coverage will also be subject to paying whatever the full monthly premiums are on 7/1/86. Employees electing to continue medical coverage as described above must submit by mail to the Company post marked by the 10th of each month, a check or money order—no cash—for the full monthly premium in effect. If an employee fails to follow any part of the procedure in the above paragraph without exception, i.e., meeting the 10th deadline, submitting by mail or submitting a check or money order, such employee's eligibility to continue medical coverage will cease immediately.

Retired Employee Medical Benefit

Individuals who attain age 60 and have at least six years of continuous service by 12-31-85, and who elect to commence their retirement benefits by 12-31-85, will be eligible for the retired employee medical benefit. Individuals who attain age 58 or 59 by 12-31-85 and who indicate by 12-31-85, their intent to commence retirement benefits by age 60 will be eligible for the retired employee medical benefit. If an employee becomes eligible for medical insurance coverage under another

plan, the Blue Cross/Blue Shield plan will be-come the secondary payer. If an individual is covered as a dependent under another medical insurance plan, then the Blue Cross/Blue Shield plan would be the secondary payer.

The retirement benefit that the Closing Agreement makes retirees eligible for is not delineated in the Closing Agreement itself. In the CBA, however, two provisions define the health insurance coverage. Section 9.01 of the CBA continues the "Hospital, Surgical and Medical Insurance" to which employees are entitled from the previous CBA, and adds some additional bene-fits. These additional benefits, effective July 1, 1982, in-clude "two (2) fifty dollar ($50.00) deductibles per family per year" and "[o]ne hundred percent (100%) coverage for physicians' home and office calls and pre-scription drugs after the deductibles are met." In full, the next section of the CBA provides:

> 9.02. Retired Employee Medical Benefit. The medical benefit provided retirees, their spouses and dependents shall be the same as defined in Section 9.01, except that benefits are provided under the "Medicare Carve-Out" program, sub-ject to the terms of the master insurance contract.
>
> In the event of the death of the retired employee, their dependent spouse will retain coverage until such time as they remarry or qualify for other primary coverage.
>
> The following conditions and terms apply to eligibility for the Retired Employee Medical Benefit:

a. The employee must be "retired" and must meet the conditions of a Retired Employee as defined in the Hayssen Retirement Plan and/or Pension Agreement, whichever applies.

b. Must enroll in Medicare Plans A and B when the employee becomes eligible.

Following the closing of its Sheboygan plant, Hayssen provided its retirees, both those who retired before the plant closing and those who were added to the retiree pool by the Closing Agreement, with medical benefits at the levels defined by the CBA. Bemis acquired Hayssen in 1996, and continued to provide retirees with these medical benefits. In the fall of 2004, Bemis notified the retirees that effective January 1, 2005, the plan would be offered under CIGNA (instead of Blue Cross/Blue Shield) and that the deductibles would be raised to $250 from the $50 listed in § 9.01 of the CBA. In the fall of 2006, Bemis notified the retirees that effective January 1, 2007, the medical plan would eliminate all prescription drug coverage.

Thomas Temme, representing the class of retirees who received the retiree medical benefit through the Closing Agreement, brought this class action suit alleging that Bemis breached its agreement to provide retirees with vested welfare benefits. The district court certified the class, and designated Thomas Temme and his wife, Shirley Temme, as class representatives. Both parties moved for summary judgment, and the district court granted summary judgment to Bemis. The plaintiffs appeal.

## II. ANALYSIS

### A.  A lifetime retiree medical benefit was the parties' intent.

We review the district court's grant of summary judgment de novo, with the familiar standard that summary judgment should be granted if there is no genuine issue of material fact and the record shows that the law entitles the moving party to judgment. *Chaklos v. Stevens*, 560 F.3d 705, 710 (7th Cir. 2009).

The parties dispute whether they intended to create a lifetime entitlement to health benefits in their agreement. To resolve this contract dispute, we look to the labor contract in question and apply federal principles of contract construction. *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 481-82 (7th Cir. 2006); *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005); *Diehl v. Twin Disc, Inc.*, 102 F.3d 301, 305 (7th Cir. 1996). A contract's meaning is a matter of law; where there is no contractual ambiguity, there is no need for extrinsic evidence and no factual dispute that precludes summary judgment. *Diehl*, 102 F.3d at 305. When interpreting contracts, terms are given their "ordinary and popular" meaning, *GCIU Employer Retirement Fund v. Chi. Tribune Co.*, 66 F.3d 862, 865 (7th Cir. 1995), the document is "read as a whole with all its parts given effect," and related documents are read together. *Bland*, 401 F.3d at 783. The contract language is ambiguous if there is more than one reasonable interpretation of it, and only if the ambiguity is not clarified elsewhere in the document will a court resort to extrinsic evidence of the parties' intent. *Id.* at 784.

Here, there are two potentially relevant documents that make up the agreement between the parties: the Closing Agreement and the last collective bargaining agreement negotiated between the parties. Because of this, we must consider, in addition to general contract principles, whether a right to lifetime health benefits is granted to retired workers by a terminated collective bargaining agreement. *See Rossetto v. Pabst Brewing Co., Inc.*, 217 F.3d 539, 541 (7th Cir. 2000) (listing cases considering the question of "when a right to health benefits that is granted to retired workers by a collective bargaining agreement . . . survives the termination of the agreement."). Under ERISA, employee benefit plans are classified as either welfare benefit plans or as pension plans. 29 U.S.C. §§ 1002(1), 1002(2)(A). Pension plans, which provide benefits to employees upon retirement or termination, are subject to strict vesting requirements. 29 U.S.C. § 1051. In comparison, welfare benefits such as health care coverage only vest in a lifetime entitlement if the plan contract specifically provides for it. 29 U.S.C. § 1051(1); *see also Bland,* 401 F.3d at 783; *Diehl,* 102 F.3d at 305. Because employers are not legally required to vest welfare benefits, and because vested benefits are forever unchangeable, there is a presumption against vesting if the plan language is silent. *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 606-07 (7th Cir. 1993) (en banc). But, this is a default rule that exists only if the contract is silent, and it disappears in the face of objective evidence or ambiguity in the parties' intent. *Bland*, 401 F.3d at 784; *Rossetto*, 217 F.3d at 544 ("If there is some positive indication of ambiguity, something to

make you scratch your head . . . the presumption falls out.").

As an initial argument, Bemis takes the position that the Closing Agreement is the contract in full, and the only document to analyze. This document, Bemis argues, is unambiguous and so there is no need to look to anything contained in the extrinsic CBA. Paragraph 4(d) of the Closing Agreement provides that retirees and soon-to-be retirees are "eligible for the retired employee medical benefit." Nowhere in the Closing Agreement is there a definition or explanation of this "retired employee medical benefit." In Bemis's reading then, the language in the closing agreement promises no benefit, let alone a lifetime benefit; it only states that certain people are "eligible" for an undefined benefit. We must remember, however, that all related documents are read together, *Bland*, 401 F.3d at 783, and the closing agreement references the CBA at multiple places. First, Paragraph 4(b) refers to the CBA when listing satisfied obligations, and the section defining the retired employee medical benefit is notably not on this list.[1]

---

[1] Paragraph 2 of the closing agreement states:

Other Benefits. As of the date of this agreement, the Company has fully satisfied its obligations and all claims under the [CBA] for the following benefits:

Health and Accident Insurance—Section 9.03

Dental Insurance—Section 9.04

Vision Care—Section 9.10

Survivor Income/Transition Benefits—Section 9.06

(continued...)

Furthermore, the Closing Agreement states it shall be the full and complete agreement and supersede the "labor Contract, pension and insurance agreements, *except and only to the extent that reference to the same may be necessary to effectuate the provisions of this agreement*." Plant Closing Agreement ¶ 6 (emphasis added). These references show an intent for the CBA and Closing Agreement to be read together. Contrary to Bemis's argument, the CBA is not extrinsic evidence, but a necessary document in gaining a complete understanding of the agreement between Bemis and the retirees. Only by reading the CBA can meaning be given to the "retired employee medical benefit" for which retirees are eligible.

Reading the Closing Agreement in conjunction with the CBA clarifies the ambiguity caused by reading the Closing Agreement on its own. The common sense reading of the two documents is that the "retired employee medical benefit" referred to in the Closing Agreement is defined by the CBA's "Retired Employee Medical Benefit" provision. Section 9.02, the Retired Employee Medical Benefit, describes the level of coverage by stating that the "medical benefit provided

---

[1] (...continued)
    These benefits ceased on July 1, 1985, and the Company
    has no further obligation for claims against it.

Section 9.03, Health and Accident Insurance, is not in the record, but it refers to a different benefit than the sections contested here, § 9.01, Hospital, Surgical and Medical Insurance, and § 9.02, Retired Employee Medical Benefit.

retirees, their spouse and dependents shall be the same" as defined in § 9.01, which describes the Hospital, Surgical and Medical Insurance provided to current employees. Bemis argues that this is not enough to create a lifetime benefit. Neither the Closing Agreement nor the CBA use duration terms such as "lifetime" or "vest" when discussing medical benefits, and Bemis argues the parties knew how to vest benefits as it used the word "vested" in relation to pension benefits. However, the lack of an explicit vesting term is not determinative. We have previously rejected the position that "magic words" or unequivocal contract language must state that lifetime benefits were being created. *Bidlack*, 993 F.2d at 607; *see also Bland*, 401 F.3d at 784. And, we have on multiple occasions noted that before the rising cost of health benefits in the 1980s, little attention may have been given to language affecting a possible future change in benefits. *Bland*, 401 F.3d at 783 (citing *Bidlack*, 993 F.2d at 613 (Cudahy, J., concurring)).

Moreover, there are straightforward indications of the parties' intent to create lifetime benefits. In *Zielinski v. Pabst Brewing Company*, we observed that a presumption against vesting is a natural fit with collective bargaining agreements because they are short-term agreements, and not presumed to create rights that continue past their termination date. 463 F.3d 615, 617-18 (7th Cir. 2006). We compared that with a shutdown agreement, and found that applying the presumption in the context of a long-term contract without an end date was less persuasive. *Id.* at 618. The contract here differs from a typical collective bargaining agreement in the same way: the parties were aware they were establishing and

settling claims for employees in a permanent and enduring fashion.

That the parties were permanently settling claims in the Closing Agreement seems particularly true when comparing the clauses dedicated to medical benefits for terminated employees and retired employees. In discussing the health and medical benefits granted to employees terminated by the Closing Agreement, it states that employees can "continue their present Blue Cross/ Blue Shield Medical coverage by paying the full monthly premium for a period of 12 months (1/1/86 to 1/1/87) or until they become covered by another medical insurance plan, whichever is sooner." It contains an ending date, and also provides for several circumstances in which the eligibility will "cease immediately" such as not paying premiums or being covered under another plan. The Closing Agreement also explicitly applies this time-limited benefit to all employees, "with the exception of those eligible employees who apply for retirement benefits by 12/31/85."

In stark contrast, the description of the retiree benefit contains no ending date, and it does not "cease immediately" upon qualification for another plan. Instead, the company plan becomes a "secondary payer." Moreover, the corresponding CBA provision provides that "in the event of the death of a retired employee," the "dependent spouse will retain coverage until such time as they remarry or qualify for other primary coverage," strongly implying that retired employees (and their spouses) are covered until death. *See Rossetto*, 217 F.3d at 545

("[A]n employer might want to specify a time limit short of death for dependent benefits yet feel no similar need to limit the duration of retirees' benefits.").

Bemis also argues that the plaintiffs have signed releases waiving all claims arising under the CBA. Upon each employee's termination, a document was signed releasing all claims under the previous CBA, and Bemis argues this includes any rights secured by § 9.02. A better understanding of the general release is that it relinquished any claim under the CBA that was not separately secured by the Closing Agreement; that the Closing Agreement secured the right to a lifetime benefit, but that the CBA defined the scope of the right. The release specifically lists an amount of payment received by each signee. The payment is the "total pay due" for payments such as severance, unused vacation pay and holidays. It also specifically lists "premium payments for continued medical coverage either as a terminated employee or a future retiree." A thorough reading of the release undercuts Bemis's argument. The release acknowledges that terminated employees and retirees will continue to receive medical coverage, but releases Bemis from making any more premium payments for that coverage.

The language contained in the Closing Agreement clearly entitles retirees to an eligibility for a specific medical benefit. The retirees represented in this action were eligible for these retiree medical benefits, and elected to commence their retirement benefits by the date indicated in the Closing Agreement. The benefit

was defined by §§ 9.01-.02 of the CBA, which promised retirees' benefits to the level of those given to current employees, and specifically detailed added benefits effective July 1, 1982. The Closing Agreement was negotiated with the purpose of creating enduring rights, had no termination date, and no method through which retiree benefits could end. We find that the parties intended to grant retirees a lifetime entitlement to medical benefits and reverse the district court's grant of summary judgment to Bemis on this issue.

### B. The district court must determine whether Bemis breached its agreement.

Bemis also argues that even if the parties intended to create a lifetime retiree employee medical benefit, Bemis is not in breach of its agreement to provide this benefit. Bemis argues it had reserved the right to modify or terminate benefits at any time as § 9.01 and § 9.02 state that the benefits are subject to the terms and conditions of an "insurance contract." Bemis claims that the master insurance contract to which the CBA refers has an explicit reservation of rights stating that the employer can modify the conditions of the plan as long as it gives written notification to the other party, and that it gave the required notice here. *See, e.g., Bland*, 401 F.3d at 786; *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 633 (7th Cir. 2004). In *Vallone*, we observed that a reservation-of-rights clause could mean that even an unambiguous term such as "lifetime" could mean "good for life unless revoked or modified." *Vallone*, 375 F.3d at 633.

If the master insurance contract contained an express reservation of rights, it is possible that Hayssen could have drastically modified the level of benefits provided to its employees while the CBA controlled the terms of the relationship between Hayssen and its employees. But, the fact that a final closing agreement incorporated or relied on language in a previous collective bargaining agreement does not mean it adopted, unmodified, any language in any underlying insurance contract. *Cf. Diehl*, 102 F.3d at 306-07 ("[T]he Shutdown Agreement itself was an independent contract, supported by separate consideration and capable of modifying or supplanting prior contractual arrangements."). If the parties intended lifetime medical benefits for retirees, then that promise could have abrogated any right Bemis may have had to terminate coverage under its master insurance contract. Moreover, as proof that this reservation of rights clause existed, Bemis points to a 1990 insurance contract and "deduces" that the relevant 1984 master contract included the same reservation of rights. Haberman Aff. ¶¶ 4-6. The 1984 contract itself however, is not the record. Temme disputes the existence of any such clause in the relevant contract. Pl.'s Br. in Resp. to Def.'s Motion for Summ. J. at 12-13. Whether the 1984 master insurance contract included a reservation-of-rights clause and whether the parties intended the clause—if any exists—to be abrogated or modified by the vested nature of the medical benefits are issues to be decided by a factfinder.

These factual disputes do not help us answer the question of what benefits the retirees are entitled to, and whether Bemis breached that agreement through its

actions in 2005 and 2007. This is a question best resolved by a factfinder in the first instance. *See Zielinski*, 463 F.3d at 621; *Diehl*, 102 F.3d at 309. The plaintiffs argue that although they understand that some benefits might have to be modified, the specific benefits laid out in the CBA must remain exactly the same. This would mean, by today's standards, an extremely generous 100% pre-scription drug coverage and $50 per year deductibles, as well as a perhaps low maximum "Major Medical" payout amount of $500,000. More likely, the parties intended that Bemis would continually provide medical coverage to retirees at a level "substantially commensurate" with the benefits provided under the CBA, but with some freedom to impose cost-saving measures that did not substantially reduce benefits. *See Diehl*, 102 F.3d at 310 ("[W]e see nothing to indicate that the Shutdown Agreement established a right to a particular insurance carrier, or even to a particular plan . . . . We therefore would read the Shutdown Agreement as requiring [defendant] to expend reasonable efforts to secure coverage at a level substantially commensurate with the benefits provided under the 1983 Insurance Agreement."). The language in the CBA and Closing Agreement also reflect this likely intent—the CBA discusses newly added benefits effec-tive in 1982 and states that retiree benefits are subject to a "Medicare Carve-out" program; and the Closing Agree-ment discusses the yearly re-evaluation of premium prices by the medical plan. Because Temme insists on the coverage provided for in the CBA, and Bemis insists that no coverage is required, neither party has explained the impact of the exact changes in the plan

or their significance upon the retirees' vested rights to insurance coverage. As we did in *Diehl* and *Zielinski*, we remand the case to the district court for further proceedings. Our discussion in those cases should offer significant guidance for the district court as it moves forward in determining the precise nature of the modifications that were implemented in 2005 and 2007, and whether the plaintiffs can meet the burden of demonstrating that the changes brought their benefits below a level reasonably commensurate with the coverage they had enjoyed for the period of time between 1985 and 2005. *Zielinski*, 463 F.3d at 619-21; *Diehl*, 102 F.3d at 310-11.

## III. CONCLUSION

The language in the Closing Agreement regarding the eligibility of the retirees to a medical benefit, read in conjunction with the CBA, shows the parties intended for the retirees to enjoy a lifetime entitlement to medical benefits. Additional determinations need to be made with respect to the level of entitled benefits and whether Bemis's 2005 and 2007 changes infringed on the retirees' vested rights. We REVERSE the grant of summary judgment to Bemis, and REMAND this case for further proceedings consistent with this opinion.