RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0030p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

———————————

JOHN L. GALLO, et al.,

*Plaintiffs-Appellees,*

*v.*

Nos. 14-3633/3918

MOEN INCORPORATED,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:13-cv-02440—James S. Gwin, District Judge.

Argued: October 15, 2015

Decided and Filed: February 8, 2016

Before: BOGGS, SUTTON, and STRANCH, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Bobby Roy Burchfield, MCDERMOTT WILL & EMERY LLP, Washington, D.C., for Appellant. Joyce Goldstein, GOLDSTEIN GRAGEL LLC, Cleveland, Ohio, for Appellees. **ON BRIEF:** Bobby Roy Burchfield, Joshua David Rogaczewski, MCDERMOTT WILL & EMERY LLP, Washington, D.C., Kirk Watkins, MCDERMOTT WILL & EMERY LLP, Chicago, Illinois, for Appellant. Joyce Goldstein, Richard L. Stoper, Jr., GOLDSTEIN GRAGEL LLC, Cleveland, Ohio, for Appellees. Douglas A. Darch, BAKER & MCKENZIE LLP, Chicago, Illinois, Christopher Landau, K. Winn Allen, KIRKLAND & ELLIS LLP, Washington, D.C., for Amici Curiae.

SUTTON, J., delivered the opinion of the court in which BOGGS, J., joined. STRANCH, J. (pp. 14–24), delivered a separate dissenting opinion.

---

**OPINION**

---

SUTTON, Circuit Judge.  At issue is whether several collective bargaining agreements entitle a class of retirees from Moen Inc. to vested healthcare benefits for life.  The district court granted relief to the class based on *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), and other Sixth Circuit decisions applying *Yard-Man*.  In *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015), decided *after* the district court's decision in this case, the Court repudiated the *Yard-Man* line of cases.  Consistent with *Tackett*, we must reverse the district court's decision.

I.

Between 1983 and 2005, Moen and its predecessor corporation entered into a series of (usually) three-year collective bargaining agreements (often called CBAs) with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its local affiliate.  Each agreement offered two types of health-related benefits to individuals who retired from Moen's plant in Elyria, Ohio:  (1) hospitalization, surgical, and medical coverage and (2) Medicare Part B premium reimbursements, which compensated retirees for the expenses of participating in the federal government's medical insurance program.  Employees who retired between August 8, 1983, and March 1, 1996, along with their dependents, received "[c]ontinued hospitalization, surgical and medical coverage . . . without cost."  *E.g.*, R. 52-11 at 42; R. 52-14 at 76.  If the retirees were over age 65, the company also reimbursed the full cost of their Medicare Part B premiums, and it did the same for retirees' spouses over age 65.  Employees who retired on or after March 1, 1996, along with their dependents, received hospitalization, surgical, and medical coverage upon payment of a co-premium.  "The co-premium amount for the retiree," the CBAs provided, "will be frozen at the co-premium in effect at [the] time of retirement."  *E.g.*, R. 52-15 at 37; R. 52-18 at 36.  If over 65, these retirees (plus their over-65 spouses) received Medicare Part B premium reimbursements at specified rates.

The parties terminated the last CBA in 2008, when Moen shut down its Elyria operations. The UAW and its local affiliate entered into a "Closure Effects Agreement" with Moen, providing that healthcare coverage "shall continue" for retirees and their spouses "as indicated under the [final] Collective Bargaining Agreement." R. 52-23 at 2, 7. The plant closed in December 2008.

After the plant closed, Moen continued to provide the same healthcare benefits to its retirees for a while. In March 2013, the company decreased the benefits available for retirees in response to "recent Medicare improvements" and "more effective supplemental benefit plans," as well as the federal government's imposition of an excise tax on high-cost "Cadillac plans" through the Patient Protection and Affordable Care Act, *see* 26 U.S.C. § 4980I. R. 51-31 at 1; R. 52-30 at 5. After the changes, Medicare-eligible retirees no longer received healthcare coverage or Part B premium reimbursements, and the company shifted non-Medicare-eligible retirees to a healthcare plan that required higher out-of-pocket payments.

Seven retirees and the UAW sued Moen in response. The retirees argued that their healthcare benefits had "vested" under the CBAs and the plant closing agreement, prohibiting Moen from changing their coverage. The district court certified a class of "all Moen healthcare benefits plan participants" who had retired from the Elyria plant and who were not covered by an earlier settlement agreement. R. 42 at 2. The class includes roughly 200 individuals. Both parties filed motions for summary judgment, and the district court granted the plaintiffs' motion. Relying on *Yard-Man*, the court concluded that the CBAs and the plant closing agreement required Moen to offer the same healthcare benefits to the retirees for life. The court also granted $776,767.19 in attorney's fees and costs to the plaintiffs. Moen appealed.

II.

*M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015), orients this appeal. In reversing a decision from our court, the Supreme Court instructed us to interpret collective bargaining agreements "according to ordinary principles of contract law." *Id.* at 933. The Court then instructed us what not to do in applying these principles. It repudiated *Yard-Man* and its heirs, directing us not to "plac[e] a thumb on the scale in favor of vested retiree benefits in all

collective-bargaining agreements." *Id.* at 935. It rejected our prior "inferences" in favor of vesting healthcare benefits for life as "too speculative and too far removed from the context of any particular contract to be useful in discerning the parties' intention." *Id.* It rejected our prior assumption that "retiree health care benefits are not subjects of mandatory collective bargaining," pointing out that parties frequently "voluntarily agree" to bargain about retiree healthcare. *Id.* at 936. It rejected our "premise that retiree benefits are a form of deferred compensation," reminding us that Congress has rejected that premise. *Id.*; *see* 29 U.S.C. § 1002(1), (2)(A)(ii). It directed us to consider the general durational clauses in the CBAs (usually three years) in deciding how long a company has committed to provide healthcare benefits to retirees. 135 S. Ct. at 936. It told us that "courts should not construe ambiguous writings to create lifetime promises." *Id.* And it explained that, "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life." *Id.* at 937; *see generally Tackett v. M&G Polymers USA, LLC*, No. 12-3329, 2016 WL 240414, at *3–4 (6th Cir. Jan. 21, 2016).

The Court offered one more piece of guidance. At the same time it rejected *Yard-Man*, it endorsed our decision in *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) (en banc). *Sprague* rejected the application of *Yard-Man* in the context of noncollectively bargained contracts about retiree healthcare benefits and refused to infer from silence and ambiguous contracts a commitment to unalterable healthcare benefits to retirees for life. *Id.* at 400. *Tackett* thus directed us to treat collectively and noncollectively bargained contracts about retiree healthcare benefits similarly—to apply the same basic rules of contract interpretation to both sets of contracts. *See* 135 S. Ct. at 936–37.

Guided by the Court's directives about what to do and what not to do in this area, we must conclude that the Moen-UAW collective bargaining agreements do not provide unalterable healthcare benefits for life to the Elyria retirees and their dependents. Here are the key provisions of the 2005 CBA, similar in relevant part to the earlier CBAs:

> Continued hospitalization, surgical and medical coverage will be provided without cost to past pensioners and their dependents prior to March 1, 1996.
>
> . . .

Effective March 1, 1996, future retirees will be covered under the new medical plan. The co-premium amount for the retiree will be frozen at the co-premium in effect at time of retirement.

. . .

Future retirees as of [January 1999] will be reimbursed for Medicare Part B for employee and spouse at Medicare Part B $45.50/$91.00.

R. 52-18 at 36.

*First and foremost*, nothing in this or any of the other CBAs says that Moen committed to provide unalterable healthcare benefits to retirees and their spouses for life. That is what matters, and that is where the plaintiffs fall short. *Tackett* directs us to apply ordinary contract principles and not to tilt the inquiry in favor of vesting—a frame of reference that prompts two questions. What is the contract right that the plaintiffs seek to vindicate? And does the contract contain that right? The plaintiffs claim a right to healthcare benefits for life. But the contracts never make that commitment. Yes, Moen offered retirees healthcare benefits. And yes Moen, like many employers, may have wished that business conditions and stable healthcare costs (hope springs eternal) would permit it to provide similar healthcare benefits to retirees throughout retirement. But the question is whether the two parties signed a contract to that effect. Nothing of the sort appears in the collective bargaining agreements. *See Tackett*, 135 S. Ct. at 937.

*Second*, not only do the CBAs fail to say that Moen committed to provide unalterable healthcare benefits for life to retirees, everything they say about the topic was contained in a *three-year* agreement. If we do not expect to find "elephants in mouseholes" in construing statutes, *see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), we should not expect to find lifetime commitments in time-limited agreements, *Tackett*, 135 S. Ct. at 936. Each of the CBAs made commitments for approximately three-year terms—well short of commitments for life. Present in each CBA, the general durational clause supplied a concrete date of expiration after which either party could terminate the agreement. When a specific provision of the CBA does not include an end date, we refer to the general durational clause to determine that provision's termination. *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 207 (1991). Absent a

longer time limit in the context of a specific provision, the general durational clause supplies a final phrase to every term in the CBA: "until this agreement ends." *See id.*; *see also Tackett*, 135 S. Ct. at 936. Reading the healthcare provisions in conjunction with the general durational clause gives meaning to the phrases "[c]ontinued," "will be provided," "will be covered," and the like. These terms *guarantee* benefits until the agreement expires, nothing more. *See UAW v. Skinner Engine Co.*, 188 F.3d 130, 141 (3d Cir. 1999); *Senn v. United Dominion Indus., Inc.*, 951 F.2d 806, 816 (7th Cir. 1992).

Consistent with traditional contract interpretation principles and with prior precedents of the Supreme Court, "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement." *Litton*, 501 U.S. at 207. Any other approach, *Tackett* explained, "distort[s] the text" of CBAs by "refus[ing] to apply general durational clauses to provisions governing retiree benefits." 135 S. Ct. at 936. Because "the written agreement is presumed to encompass the whole agreement of the parties," *id.*, and because Congress has placed special emphasis on the "written terms" of retiree healthcare plans, *id.* at 933 (quotation omitted); *see* 29 U.S.C. § 1102(a)(1), we must enforce those terms as written. *See Heimeshoff v. Hartford Life & Accident Ins. Co.*, 134 S. Ct. 604, 611–12 (2013).

*Third*, each of the last three CBAs says that "*[c]ontinued* hospitalization, surgical and medical coverage will be provided without cost to *past pensioners and their dependents* prior to March 1, 1996." *E.g.*, R. 52-16 at 39 (emphasis added). Consistent with the three-year term of these CBAs, the language provides "continued" healthcare benefits to "past pensioners"— namely, former employees who retired under prior CBAs. There would be no need to "continue" such benefits if prior CBAs had created vested rights to such benefits. And indeed no comparable language appears in the CBA provisions dealing with *pension* benefits that vested under prior agreements.

*Fourth*, while the authors of the CBAs opted not to say that retiree healthcare benefits were vested for life, they explicitly vested pension benefits for qualifying retirees. The difference in language demands a difference in meaning. "It is understood that when [certain] benefits are no longer payable," each CBA provides, "the normal monthly survivor pension benefit will be paid for the rest of the survivor's life." *E.g.*, R. 52-18 at 34. Because a contract

"should be read to give effect to all its provisions and to render them consistent with each other," *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995), we must assume that the explicit guarantee of lifetime benefits in some provisions and not others means something. *See Skinner*, 188 F.3d at 144. The absence of vesting language in the CBAs becomes even starker when we look at the pension plan itself, which defines a "Five Year Certain and Life Annuity" as "[a] series of monthly payments *for the life of the Participant*" and a "Qualified Joint and Survivor Annuity" as "[a]n annuity *for the life of the Participant* with a survivor annuity *for the life of his spouse*." R. 52-11 at 11, 14 (emphasis added). No such language appears in the CBA provisions dealing with healthcare benefits.

*Fifth*, the agreements contain reservation-of-rights clauses that evidence an intent *not* to vest and that apply to employees and retirees. "The Company," one such clause says, "shall have the right to amend, cancel or reinsure the policies or change the underwriters thereof, so long as [specified] benefits are maintained for the life of this Agreement[.]" R. 52-18 at 33. How can one simultaneously say that healthcare benefits are "vested" but may be "cancel[ed]" by the employer? Even the caveat—that certain "benefits" must be "maintained"—applies only "for the life of this Agreement," a timeline that is incompatible with construing the agreement to create vested and unalterable benefits. And although the reservation-of-rights clause comes in a paragraph discussing employee benefits, it does not limit itself to those benefits. It instead refers to Moen's right to cancel the insurance "*policies*," which—as other sections of the CBAs demonstrate—covered employees *and* retirees. The CBAs, moreover, sometimes use the word "employee" to refer to both employees and retirees. The article that provides for retiree health insurance begins by stating that "[b]enefits described in this article apply to all *employees*," and a table outlining retiree co-premiums lists the contributions required by "[e]mployee" and "[e]mployee + 1." *Id.* at 33, 36 (emphasis added).

*Sixth*, these principles yield a similar conclusion when applied to the plant closing agreement. "Healthcare . . . and related benefits shall continue under Article XVII [of the CBA]," the contract says, "for all retirees and spouses *as indicated under the Collective Bargaining Agreement*." R. 52-23 at 7 (emphasis added). Although this provision does not specify which CBA it refers to, we presume (and the parties agree) that the relevant CBA is the

final one, the 2005 agreement.  The most natural reading of the plant closing contract is that it offers the *same* benefits under the *same* conditions as the 2005 CBA.  Because a right to permanent healthcare benefits did not vest under that CBA, it did not vest under the plant closing agreement either.

*Seventh*, the above analysis not only respects the language of the relevant agreements and *Tackett*, but it also brings our court into alignment with other circuits around the country. No court to our knowledge has found, or would find, a promise of lifetime unalterable healthcare benefits based on CBA language of this sort in a time-limited agreement.  *See Senior v. NSTAR Elec. & Gas Corp.*, 449 F.3d 206, 218–19, 224 (1st Cir. 2006); *Joyce v. Curtiss-Wright Corp.*, 171 F.3d 130, 134–35 (2d Cir. 1999); *Skinner*, 188 F.3d at 141–44; *Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 854–56 (4th Cir. 1994); *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 377–78 (5th Cir. 2008) (preliminary injunction); *Senn*, 951 F.2d at 814–16; *Anderson v. Alpha Portland Indus., Inc.*, 836 F.2d 1512, 1516–20 (8th Cir. 1988); *Bazzone v. Auto. Indus. Welfare Fund*, 860 F.2d 1088, at *2–5 (9th Cir. 1988) (unpublished table disposition).

The plaintiffs offer several contrary arguments.  They point out that the CBAs state that "[c]ontinued" coverage "*will be* provided"; that future retirees "*will be* covered"; that co-premiums "*will be* frozen"; that "[p]ension payments *will be* increased by the amount of current Medicare charges"; and that the employer "*will pay* the monthly premium charge" for retirees' health insurance.  *E.g.*, R. 52-13 at 81; R. 52-18 at 36 (emphasis added).  If *Tackett* tells us anything, however, it is that the use of the future tense without more—without words committing to retain the benefit for life—does not guarantee lifetime benefits.  135 S. Ct. at 937.  The relevant provisions offer healthcare coverage until *some point* in the future, but they do not say what that point is.

The plaintiffs invoke provisions in the CBAs that include *specific* durational limits, claiming that the absence of a comparable limit in the retiree healthcare provisions shows that the parties intended the commitment to last for life.  The 2005 CBA, for example, says that "Hospitalization, Surgical and Medical Benefits for terminated employees, including lay-off, will continue in effect for the duration of the month for which premiums have been paid, except as [specified in another provision]." R. 52-18 at 35.  The absence of specific durational limits in the

retiree benefits provisions, argue the plaintiffs, means that these benefits were meant to last for life. But specific and general terms usually work in tandem, and that is just the case here. The CBAs' general durational clauses provide a baseline or default rule, a point at which the agreements expire *absent more specific limits* relevant to a particular term. In the absence of specific language in the retiree healthcare provisions, the general durational clause controls.

Referring to some of our *Yard-Man* cases, the plaintiffs note that we have inferred that retiree healthcare benefits vest when CBAs tie eligibility for retiree healthcare benefits to eligibility for pensions. *See, e.g.*, *Noe v. PolyOne Corp.*, 520 F.3d 548, 558–59 (6th Cir. 2008); *McCoy v. Meridian Auto. Sys., Inc.*, 390 F.3d 417, 422 (6th Cir. 2004). The CBAs at issue do just that, they add, in two ways. They first provide that "[c]ontinued hospitalization, surgical and medical coverage will be provided without cost to *past pensioners* and their dependents," *e.g.*, R. 52-18 at 36 (emphasis added), rather than using a more generic term like "past employees." And some of the agreements provide Medicare Part B reimbursements by increasing retirees' pension payments. But *Tackett* rejected this kind of "tying" analysis as a relic of a misdirected frame of reference, calling it one of many *Yard-Man* inferences that was "inconsistent with ordinary principles of contract law." 135 S. Ct. at 937. Even the concurrence, which addressed the tying analysis in greater detail, stated only that tying language could shed light on the parties' intent when it connected the *duration* of pensions to the *duration* of health benefits (*e.g.*, "[R]etirees 'will receive' health-care benefits *if they are* 'receiving a monthly pension'"). *Id.* at 938 (Ginsburg, J., concurring) (emphasis added). That sort of durational linkage is absent here, where the CBAs simply state that those who are *eligible* for pensions are also *eligible* for health benefits. It is not surprising that CBAs address pension and healthcare benefits for retirees. And it is not surprising that the CBAs make pensioner status a condition of receiving healthcare benefits. But neither one of these features of the CBAs means that retirees will get those benefits *for as long as* they earn a pension, particularly since the pension provisions use vesting language and the healthcare provisions do not.

Moving beyond the language of the agreements, the plaintiffs claim that each CBA incorporates background understandings that favor lifetime vesting of retiree healthcare benefits. At the time the parties negotiated each CBA, plaintiffs note, *Yard-Man* governed and thus the

parties would have assumed that those inferences (and the unalterable lifetime healthcare benefits that go with them) would have applied. The short answer is that this new inference about prior assumptions would have been just as true in *Tackett*—a case from our circuit that involved a collective bargaining agreement negotiated when *Yard-Man* remained good law. And yet nothing in *Tackett* (or the concurrence) hints at the idea that *Yard-Man* would linger, vest as it were, as a precedent that would bind future interpretations of such agreements. This theory of background understandings also sits at a lofty level of generality, one that, if accepted, might have to account for other ever-uncertain assumptions about the future. Would healthcare costs rise at the same pace as general inflation or would they far exceed it? Would the National Government enact a national healthcare law? And, if so, would that new law impose a tax on generous, so-called Cadillac healthcare plans? Nor is it fair to assume that all parties who entered such CBAs were certain about the fate of *Yard-Man*. That explains why our court upheld substantial class-action settlements between Ford and the UAW and General Motors and the UAW that were premised in part on uncertainty about the future of *Yard-Man*. *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631–32 (6th Cir. 2007). That uncertainty was not unwarranted. No court of appeals in the country applied our *Yard-Man* inferences. And even this court refused to apply the inferences in the context of contracts that were not the subject of collective bargaining, *see Sprague*, 133 F.3d at 400—what had always been a strangely inverted regime that favored employees who had the benefit of union representation over those without it, *Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 543–44 (7th Cir. 2000).

The plaintiffs also make several arguments related to the plant closing agreement. They begin by pointing to the agreement's promise that healthcare benefits "shall continue," noting that the contract includes neither a general nor a specific durational clause that might limit the period of continuation. But this argument ignores the context of the relevant language, which states that healthcare benefits "shall continue . . . *as indicated under the [2005] Collective Bargaining Agreement*." R. 52-23 at 7 (emphasis added). The contract thus did not need explicit durational language because it incorporated the terms of the 2005 CBA, which did not provide for vested benefits.

But, the plaintiffs persist, doesn't this interpretation make the "shall continue" clause redundant? An earlier provision of the plant closing agreement provided that "[a]ll terms and conditions of the 2005–2008 Collective Bargaining Agreement shall remain in effect until all bargaining unit employees cease working at the facility." *Id.* at 2. If the contract already provided that the 2005 CBA would govern until the last unionized employee left, then it would not have been necessary to include an *additional* provision stating that benefits "shall continue" for as long as the 2005 CBA permits. But the rule that courts should interpret contracts to avoid superfluous words is a "tool[] for dealing with ambiguity, not a tool for *creating* ambiguity in the first place." *TMW Enters., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 578 (6th Cir. 2010). Because the phrase "as indicated under the Collective Bargaining Agreement" is unambiguous, there is no reason to invoke an interpretive canon that would convert a clear phrase into a misty one. That is particularly true when the plaintiffs' interpretation does nothing to reduce the alleged redundancy. If, as the plaintiffs claim, the CBAs already vested healthcare benefits, there was no need to provide for the continuation of those benefits in the plant closing agreement at all.

The plaintiffs point to two cases to support their reading of the plant closing contract, but both are inapposite. The plant closing agreements in *Temme v. Bemis Co.*, 622 F.3d 730, 733, 736–37 (7th Cir. 2010), and *Zielinski v. Pabst Brewing Co.*, 463 F.3d 615, 616–18 (7th Cir. 2006), did not incorporate the time limits of previous CBAs—and, to the extent they impliedly incorporated such limits, the language of the earlier CBAs was itself consistent with vesting. The problem here is that the final CBA does *not* offer vested benefits, meaning that an agreement that incorporates it by reference does not do so either.

The plaintiffs point to extrinsic evidence, such as the fact that Moen continued paying healthcare benefits for five years after the plant closing agreement expired, claiming that this shows the parties' "inten[t]" to create vested and unalterable retiree healthcare benefits. Appellees' Br. 57. Two responses. The first and best way to divine the intent of the parties is from the four corners of their contract and from traditional canons of contract interpretation. That language and these canons offer no evidence of any intent to fix these benefits permanently into the future. Absent ambiguity from this threshold inquiry, no basis for going beyond the contract's four corners exists. *See Witmer v. Acument Global Techs., Inc.*, 694 F.3d 774, 778

(6th Cir. 2012). At any rate, a company does not act inconsistently when (1) it continues paying healthcare benefits to retirees and (2) reserves the right to alter or eliminate those benefits in the future. That a company to its credit hopes to subsidize healthcare benefits for its retirees for as long as possible does not mean it has promised to do so, and above all such action does not mean that it has no right to alter those benefits in the future to account for changes to its healthcare plans for employees or, as here, to account for new federal legislation.

One other point. Moen argues that *Tackett* creates a clear-statement rule—that, before a retiree may impose a duty on a company to provide vested and unalterable healthcare benefits, it must satisfy the rigors of clarity associated with waivers of sovereign immunity and the like. *See United States v. Nordic Vill., Inc.*, 503 U.S. 30, 33–34 (1992). But clear-statement rules of this sort generally come into play *after* courts deploy the customary rules of interpretation. *See id.* at 34–37; *Gregory v. Ashcroft*, 501 U.S. 452, 464–67 (1991); *Dellmuth v. Muth*, 491 U.S. 223, 227–32 (1989). Only at that point do courts ask whether the parties or the legislature, as the case may be, has clearly/expressly/plainly created the duty at issue and only at that point do they establish a default rule in favor of or against certain outcomes or policies.

*Tackett* does not create such a rule. It tells courts to apply "ordinary principles of contract law"—identifying relevant principles in this setting along the way—and tells courts to follow those principles where they lead. 135 S. Ct. at 933. That approach of course still permits courts to draw implications and inferences from the language of the contract. Interpretation always requires the reader to take signals from the writer in one way or another. When contracting parties say one thing in a part of the contract and say something else in a related section, to use one example, they imply a difference in meaning. And when readers see a benefit created in a three-year contract, to use another, they are entitled to infer that any right to the benefit ends after three years. In overruling *Yard-Man*, in short, *Tackett* does not create a clear-statement rule in the other direction. It instead eliminates the use of inferences and implications not grounded in "ordinary principles of contract law" and explains the kinds of tools properly deployed in this setting. As applied to *this set of contracts*, those principles require the conclusion that no vesting occurred.

III.

Moen also challenges the district court's award of attorney's fees and costs. Because we reverse the district court's judgment, we vacate its fee award too. *See Reese v. CNH Am. LLC*, 574 F.3d 315, 328 (6th Cir. 2009).

IV.

For these reasons, we reverse the district court's grant of summary judgment, vacate the attorney's fee award, and remand the case for the district court to enter judgment for the defendant.

_____

**DISSENT**

_____

STRANCH, Circuit Judge, dissenting.   I agree that the Supreme Court's decision in *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015), governs this case and have no quarrel with much of the majority's articulation of its holding.  I do not dispute that the Supreme Court rejected certain "inferences" applied by our court in *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), and its progeny, finding them to be "inconsistent with ordinary principles of contract law." *Tackett,* 135 S. Ct. at 937.  The majority also correctly recognizes that *Tackett* does not create a clear-statement rule in favor of employers:  employees are not required to "satisfy the rigors of clarity" to vest retiree healthcare benefits. (Maj. Op. at 12.)  Instead, as this court clarified on remand, the Supreme Court "declined to adopt an 'explicit language' requirement in favor of companies" and instead instructed that courts are to interpret collective bargaining agreements in accordance with ordinary contract principles—without placing a thumb on the scale for either employers or employees. *Tackett v. M & G Polymers USA, LLC*, No. 12-3329, 2016 WL 240414, at \*4–5 (6th Cir. Jan. 21, 2016) (published).[1]  It is here that my disagreement arises.  I think that the majority transgressed this admonition by placing a thumb on the employer's scale.

The question presented is whether Moen Incorporated's Retirees (a designation that includes their spouses and eligible dependents) are correct in their claim that the collective bargaining agreements and plant closing agreement grant vested, lifetime healthcare benefits to Retirees.  The majority determines that ordinary contract principles compel the conclusion that the agreements unambiguously do not grant lifetime healthcare benefits and then declines to address the bulk of the extrinsic evidence presented by Retirees.  I disagree with both determinations.  I conclude that the language of the agreements—when properly viewed in their

---

[1]The Supreme Court's remand marked the case's third appearance before this court (*Tackett III*), which previously heard appeals from the district court's dismissal of the complaint, *Tackett v. M & G Polymers USA, LLC*, 561 F.3d 478 (6th Cir. 2009) (per curiam) (*Tackett I*), and judgment following a bench trial, *Tackett v. M & G Polymers USA, LLC*, 733 F.3d 589 (6th Cir. 2013) (*Tackett II*).  To maintain consistency with the case references, the appropriate Roman numeral will be used to identify our cases, and the Supreme Court case will be referenced simply as *Tackett*.

entirety—is ambiguous and that the extrinsic evidence resolves the ambiguity in favor of Retirees. I therefore respectfully dissent.

## I. Applying Ordinary Principles of Contract Law

In interpreting a collective bargaining agreement, as with any other contract, "the parties' intentions control." *Tackett,* 135 S. Ct. at 933 (quoting *Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010)). "Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Id.* (quoting 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed. 2012) (Williston)). At this stage, courts "may look to known customs or usages in a particular industry to determine the meaning of a contract," as long as the custom or usage is supported by affirmative evidence in the particular case. *Id.* at 935 (citing 12 Williston § 34:3). Where the parties' intentions remain ambiguous after review of the language of the agreement, extrinsic evidence may be used to resolve that ambiguity. *Id.* at 937–38 (Ginsburg, J., concurring) (citing 11 Williston § 30:7, p. 116–124); *see also Brooklyn Life Ins. Co. of N.Y. v. Dutcher*, 95 U.S. 269, 273 (1877) ("There is no surer way to find out what parties meant, than to see what they have done.").

Because courts consider both industry customs or usages and extrinsic evidence to determine the meaning of a contract, context matters. *See Tackett*, 135 S. Ct. at 935. As the Supreme Court acknowledged in *Tackett*, the context here—interpretation of collective bargaining agreements negotiated between representatives of the company and its employees/retirees in the manufacturing industry—calls for application of "ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." *Id.* at 933 (citing *Textile Workers v. Lincoln Mills, of Ala.*, 353 U.S. 448, 456–57 (1957)). Federal labor policy has long recognized the unique character of collective bargaining relationships: "[t]he collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant," which "implements and furnishes the context of the agreement." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 579–80 (1960). Accordingly, context is particularly important here.

Recognizing the importance of context, Retirees urge this court to consider the background understandings of the parties. *Tackett III* acknowledged that the Supreme Court "did not purport to discuss all of the ordinary principles of contract law" and identified other ordinary contract principles showing that courts may consider background understandings. *See Tackett III*, 2016 WL 240414, at *4 (identifying additional "ordinary principles of contract law" from Justice Ginsburg's concurrence (including that courts may consider the parties' "bargaining history") and from the parties' arguments referencing 11 Williston § 30:19 (stating that courts may consider "that contracts incorporate existing law")). Discounting this context, however, the majority concludes that the legal distinction between benefit packages that are the subject of collective bargaining and those that are not is a "strangely inverted regime" that favors employees who have "the benefit of union representation." (Maj. Op. at 10 (citing *Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 543–44 (7th Cir. 2000)).)**[2]** In other words, the majority suggests that collective bargaining agreements should be interpreted without consideration of the background understandings that are unique to collective bargaining. Of course all employees share a legitimate concern about their benefit packages, but, as recognized by federal labor policy, a collective bargaining system entails practical distinctions from other contracting situations.

The majority's refusal to acknowledge distinctions regarding the nature of collective bargaining causes it to mischaracterize Retirees' argument that courts should consider the background understandings of the parties as nothing more than a request to adopt a "new inference about prior assumptions." (Maj. Op. at 9–10.) Based on its mischaracterization, the majority then attacks Retirees' argument by positing a list of "ever-uncertain assumptions about the future" for which courts should not account. (*Id.* at 10) That discussion is simply inapposite (though it should be acknowledged that uncertainties don't just strike those fearing the cost to

---

**[2]***Pabst* presents the same issue as this case but is inapplicable because it arises under the Seventh Circuit's presumption that, under a collective bargaining agreement that is silent on the issue, entitlement to healthcare benefits expires with that agreement unless a canvass of its language reveals a patent ambiguity or there is objective evidence showing a latent ambiguity. 217 F.3d at 545, 547. That court's consideration of latent ambiguity, however, has some relevance to our case, as the opinion recognizes that even if contract language seems clear, an examination for latent ambiguity is based on the "real-world context of application," *id.* at 543, viewed under federal common law, *id.* at 541, which is developed pursuant to federal labor law and policy.

provide healthcare coverage—there are plenty of uncertainties for Retirees fearing the loss of their family's healthcare coverage).

Retirees' argument is not about whether today we can posit uncertainties—it merely proposes a proper examination of "the entire agreement in light of relevant industry-specific 'customs, practices, usages, and terminology'" and other ordinary principles of contract law. *Tackett*, 135 S. Ct. at 937–38 (Ginsburg, J., concurring). The argument requests an examination directed to the context when the parties *entered the CBA*. For example, one context wholly missed by the majority is the reality that collective bargaining negotiations for employee contractual pay and benefit packages routinely entail a primarily fixed amount of money to be divided between pay and benefits. In collective bargaining, negotiating additional contributions into benefits means less pay in an employee's pocket, which is a dynamic different from non-represented industries. Thus, in applying ordinary contract principles, it is appropriate to recognize the industrial reality of the give and take of a negotiated union contract when gathering the intention of the parties from the whole instrument.

## A. Language of the Agreements

The majority serially examines and rejects each contract argument of Retirees as insufficient to show either a contractual commitment to provide lifetime healthcare benefits or an ambiguity in the contract documents that would allow for examination of extrinsic evidence. But this divide and conquer analysis transgresses the "cardinal principle" of contract interpretation: the intention of the parties to a contract is "to be gathered from the whole instrument." *Id.* (quoting 11 Williston § 30:2, p. 27). Characteristics and particulars of the whole instrument—the collective bargaining agreements and the plant closing agreement—must be considered together. I turn now to examination of these agreements.

Retirees argue that the use of future tense language throughout the collective bargaining agreements evidences intent to vest retiree healthcare. The majority opines that, "[i]f *Tackett* tells us anything," it is that the future tense language used by the parties, without more, "does not guarantee lifetime benefits." (Maj. Op. at 8 (citing *Tackett*, 135 S. Ct. at 937).) But *Tackett* did not address what may be implied from the use of future tense and expressly chose not to answer

the vesting question but to remand it for this court to do so, absent the *Yard-Man* inferences. *See Tackett III*, 2016 WL 240414, at *1. In *Litton Financial Printing Division, a Division of Litton Business Systems, Inc. v. NLRB*, moreover, the Supreme Court explained that duties in a contract may arise from its "express or implied terms." 501 U.S. 190, 203, 207 (1991). Consistent with the "cardinal principle" of contract interpretation, we must look to both express and implied terms in all the agreements to determine the intention of the parties. *See Tackett III*, 2016 WL 240414, at *4 (citing *Litton*, 501 U.S. at 207).

The majority dismisses out of hand the standalone argument based on future tense language and instead specifies an additional requirement to point to "words committing to retain the benefit for life"—an addition at odds with *Litton*. (Maj. Op. at 8.) The future tense language used in the agreements, however, could imply intent that retiree healthcare be vested—especially if other aspects of the "whole instrument" point in that direction. Both are true here. The 2005 collective bargaining agreement, for example, provides that "[c]ontinued hospitalization, surgical and medical coverage will be provided without cost to past pensioners and their dependents"; "future retirees will be covered under the new medical plan"; "[t]he co-premium amount for the retiree will be frozen at the co-premium in effect at the time of retirement"; and "[t]he Company will pay the monthly premium charge . . . for all retirees and future retirees . . . and their eligible dependents under the terms of the policy." It is appropriate to consider the presence of this future tense language in the agreements, along with their other characteristics and particulars, to ascertain the intention of the parties. The majority's blanket conclusion otherwise amounts to a clear statement rule in favor of employers, a position that it correctly disavowed as contrary to *Tackett*. (Maj. Op. at 12.) *See Tackett III*, 2016 WL 240414, at *4.

Turning to other evidence of intent to vest that can be gleaned from the "whole instrument," Retirees cite the link in the agreements between retiree healthcare benefits and pensioner status. The 2005 collective bargaining agreement states that health benefits "will be provided without cost to past pensioners and their dependents" and includes Medicare Part B reimbursements in "pension payments." The majority presumes this language to refer to eligibility and then concludes that "*Tackett* rejected this kind of 'tying' analysis." (Maj. Op. at 9.) The Supreme Court did reject as an improper inference the conclusion that "the tying of

eligibility for health care benefits to receipt of pension benefits suggested an intent to vest health care benefits." *Tackett*, 135 S. Ct. at 937. But the contract language before us does not refer to eligibility. Justice Ginsburg's concurrence illustrates a proper examination of contractual language that specifies the relationship between healthcare and pension benefits: "[b]ecause the retirees have a vested, lifetime right to a monthly pension . . . a provision stating that retirees 'will receive' health-care benefits if they are 'receiving a monthly pension' is relevant to the examination." *See id.* at 938 (Ginsburg, J., concurring). The majority posits the necessity for magic language ("for as long as") (Maj. Op. at 9), but the agreement at issue in *Tackett* did not contain that language, the majority did not require that language, and Justice Ginsburg's example did not include that language. Tracking Justice Ginsburg's example, the contract language here specifies that Retirees have a vested, lifetime right to a monthly pension and "will receive" healthcare benefits if they are "pensioners." This is *durational* tying language that is relevant to our examination of the "whole instrument."

Retirees also argue that intent to vest is suggested by the agreements' inclusion of explicit durational limitations for other benefits but not retiree healthcare. For example, the 2005 collective bargaining agreement limits the time in which terminated and laid-off *employees* may receive healthcare, and the plant closing agreement gives healthcare benefits to *employees* for certain time periods based on the employee's length of service. The majority dismisses this argument based on the collective bargaining agreements' inclusion of general durational clauses. Noting that "we should not expect to find lifetime commitments in time-limited agreements," the majority presumes that when a specific provision of a collective bargaining agreement does not include an explicit end date that provision must be governed by the general durational clause of the agreement. (Maj. Op. at 5–6 (citing *Tackett*, 135 S. Ct. at 936).)

As acknowledged by *Tackett III*, the majority's formulation is neither authorized nor compelled by *Tackett* and improperly places a thumb on the employers' scale. *See Tackett III*, 2016 WL 240414, at *4. The Supreme Court did criticize *Yard-Man* and its progeny for creating presumptions of vesting "not from record evidence, but instead from its own suppositions about the intentions," including the presumptions that "a general durational clause *says nothing* about the vesting of retiree benefits" and that a contract must "include a specific durational clause for

retiree health care benefits to prevent vesting." *Tackett*, 135 S. Ct. at 935–36 (quoting *Noe v. PolyOne Corp.*, 520 F.3d 548, 555 (6th Cir. 2008)). But those criticisms do not authorize the majority's opposite inferences—that a general durational clause says *everything* about vesting and that vesting occurs *only* if the contract includes a "longer time limit" in the "specific provision." (Maj. Op. at 5–6.) *See Tackett III*, 2016 WL 240414, at *4 ("[W]e also cannot presume that the *absence* of such specific language, by itself, evidences an intent *not* to vest benefits or that a general durational clause says *everything* about the intent to vest."). Having noted that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement," the Supreme Court explained that this "principle does not preclude the conclusion that the parties intended to vest lifetime benefits for retirees." *Tackett*, 135 S. Ct. at 937 (citing *Litton*, 501 U.S. at 207). *Litton* teaches that "[e]xceptions [to this ordinary course] are determined by contract interpretation. Rights which accrued or vested under the agreement will, as a general rule, survive termination of the agreement," *Litton*, 501 U.S. at 207, and "constraints upon the employer" may arise "from the express or implied terms of the expired agreement," *id.* at 203. Thus, we must "consider all relevant contractual language in light of industry practices," seeking the express or implied intention of the parties. *Tackett*, 135 S. Ct. at 938 (Ginsburg, J., concurring).

Relevant contract language also includes the 2008 plant closing agreement, which states that the 2005 collective bargaining agreement shall cease to exist, "except for items as agreed to in this agreement," when "all bargaining unit employees cease working at the facility." Retiree healthcare is identified as an item that will not cease to exist upon plant closure: "Healthcare, Sub and Pension and related benefits shall continue . . . for all retirees and spouses as indicated under the [2005 agreement]." Retirees argue that the only way to make this benefits continuation clause not redundant or superfluous is to interpret it as recognizing the intent to vest retiree healthcare benefits in the collective bargaining agreements and authorizing provision after the plant's closing. *See TMW Enters., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 578 (6th Cir. 2010) (holding that courts, to deal with ambiguity, should interpret contracts to avoid superfluous words).

The majority rejects Retirees' argument by concluding that the plant closing agreement simply incorporates the terms of the 2005 collective bargaining agreement and, because that agreement did not provide for vested benefits, "an agreement that incorporates it by reference does not do so either." (Maj. Op. at 11.) The majority then denies applicability of the rule against superfluous words on the basis that the rule is a "tool[] for dealing with ambiguity, not a tool for *creating* ambiguity in the first place," and that the plant closing agreement's clause incorporating the 2005 agreement is unambiguous. (*Id.* (quoting *TMW Enters., Inc.*, 619 F.3d at 578).)

Again, contract principles dictate that we seek the intention of the parties from the whole of the contract language—here, both the collective bargaining agreements and the plant closing agreement. Interpreting the collective bargaining agreements as not vesting retiree healthcare benefits renders the plant closing agreement's "shall continue" clause superfluous. If retiree healthcare was not vested by the 2005 collective bargaining agreement, then the benefits would have terminated pursuant to the plant closing agreement's general provision that the 2005 agreement will cease to exist upon plant closing. There would have been no reason for the parties to reiterate, in the same document, that the benefits "shall continue" for as long as the 2005 agreement permits. It did not do so for any other non-vested provisions. Interpreting the 2005 agreement as vesting retiree healthcare, on the other hand, would give the plant closing agreement's "shall continue" clause meaning. Specifically, the clause would confirm that retiree healthcare benefits, as vested by the 2005 agreement, are not subject to the plant closing agreements' general provision that the 2005 agreement will cease to exist upon plant closing. The rule against superfluous words thus resolves ambiguity that could have arisen in the language of the two contracts.

As a final point, the majority construes the collective bargaining agreements' reservation-of-rights clauses as evidencing an intent not to vest. (Maj. Op. at 7.) The answer to that is simple: that provision does not unambiguously apply to Retirees. In each of the collective bargaining agreements, the reservation-of-rights clause is contained in a separate paragraph furnishing insurance for Moen's "employees," not their "retirees," while different contract paragraphs govern retiree health insurance. The term "employee" has meaning: "[t]he ordinary

meaning of 'employee' does not include retired workers; retired employees have ceased to work for another for hire." *Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co., Chem. Div.*, 404 U.S. 157, 168 (1971). But even if the reservation of rights clause did apply to Retirees, the other provisions evidencing intent to vest renders the agreements as a whole ambiguous.

Applying ordinary contract principles and the Supreme Court's instructions in *Tackett* to all of the relevant contract language viewed in light of industry practices reveals ambiguity within the various contract provisions. Because the parties' intentions cannot be derived unambiguously from the language of the agreements, I turn to the extrinsic evidence to see whether the ambiguity may be resolved.

**B. Extrinsic Evidence**

The record contains objective evidence of the parties intent to vest retiree healthcare benefits. That evidence includes statements from Moen representatives to Retirees—made in negotiating sessions, before the pension committee, and in one-on-one conversations—that their benefits were "for life" or "forever" and advising surviving spouses that they were "entitled" to continue medical benefits upon the death of a Retiree. Moen's Retirement Health Enrollment Forms contain no indication to Retirees that their health benefits could be cancelled or the premiums paid increased. Surviving spouses of Retirees were assured in writing that "as long as" the spouse continues to receive a pension, they "would continue to be covered under the group insurance program," expressly linking the duration of retiree healthcare to pensioner status. In accordance with this understanding, the parties operated for decades as if the retiree benefits were vested—Moen continued to provide benefits until 2014, years after the plant had closed. *See UAW v. Skinner Engine Co.*, 188 F.3d 130, 144 (3d Cir. 1999) (holding that courts may infer from employer continuing to provide retiree benefits after termination of a collective bargaining agreement that retiree benefits were vested by that agreement); *Weimer v. Kurz-Kasch, Inc.*, 773 F.2d 669, 676 n.6 (6th Cir. 1985) (same); *Bower v. Bunker Hill*, 725 F.2d 1221, 1225 (9th Cir. 1984) (same). Moen never reduced retiree benefits, and each Retiree's benefits mirrored the benefits provided at the time he or she retired.

In addition, the record reveals that many employees, following the plant closing agreement but before plant closure, chose to take a significantly reduced pension and retire early under an active 2005 collective bargaining agreement in order to qualify for retiree healthcare benefits.  By choosing to retire early, these employees accepted an actuarial reduction in their pension of "a percentage equal to 1/2 of 1%" for each *month* prior to their 62nd birthday.  One employee, for example, qualified for and took early retirement at age 58 and testified to suffering a 23% reduction in his lifetime monthly pension benefit.  The choice to take a significantly reduced pension across their lifetime makes no sense unless these employees were told and believed that, by retiring during the term of the 2005 collective bargaining agreement, they would receive vested retiree healthcare.

The majority responds that the language of the agreements is unambiguous and thus extrinsic evidence must be ignored.  It then indirectly addresses the parties' actions regarding retiree healthcare by doing just what *Tackett* warned against—assessing intent based on its own suppositions that have no support in the record (and are in fact contradicted by it).  *See Tackett*, 135 S. Ct. at 935 (chastising this court for "deriv[ing] its assessment of likely behavior not from record evidence, but instead from its own suppositions").  For example, the majority opines that "Moen, like many employers, may have wished that business conditions and stable healthcare costs (hope springs eternal) would permit it to provide similar healthcare benefits to retirees throughout retirement."  (Maj. Op. at 5.)  In that same vein, the majority assigns favorable motivation to Moen, opining that a company cannot be blamed for hoping "to its credit . . . to subsidize healthcare benefits for its retirees for as long as possible."  (Maj. Op. at 12.)

The majority points to no record evidence supporting these assessments of the parties' intentions.  Such conclusions of benevolence are belied by the statements and admissions regarding Moen's contractual responsibilities.  The majority's assessments, therefore, are speculative and far removed from the context of these particular agreements and the practices of this industry, and thus cannot be used to explain away the extrinsic evidence that reveals an intent to vest retiree healthcare benefits.

**II. Conclusion**

The majority examines the contractual agreements piece-by-piece while broadening and misapplying the Supreme Court's decision in *Tackett* to find that the parties' unambiguously intended not to vest retiree healthcare. Reviewing the whole of the contractual agreements and the specific contract language evidencing the intentions of the parties leads me to conclude that the CBA and the plant closing agreements are ambiguous on the issue of vested retiree healthcare benefits. The background understandings of the parties; realities of the relationship between the parties; customs, practices, and usages in the industry; context of negotiations; and law and policy also lead to that conclusion. The extrinsic evidence, including the statements and actions of the parties, resolves that ambiguity in favor of Retirees. Thus, under the standard set out in *Tackett,* the district court's grant of summary judgment to Retirees should be affirmed.